**2021 UT 57**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

AYAYAI AZIAKANOU,
*Appellant.*

No. 20180284
Heard October 9, 2020
Filed September 30, 2021

On Direct Appeal

Third District, Salt Lake
The Honorable Paul B. Parker
No. 171911262

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey S. Gray, Asst. Solic. Gen., Paul S. Fuller, Salt Lake City, for appellee

Debra M. Nelson, McCaye Christenson, David P.S. Mack, Salt Lake City, for appellant

JUSTICE PETERSEN authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS, and JUSTICE PEARCE joined.

ASSOCIATE CHIEF JUSTICE LEE authored a concurring opinion.

JUSTICE HIMONAS authored a concurring opinion, in which CHIEF JUSTICE DURRANT, JUSTICE PEARCE, and JUSTICE PETERSEN joined.

JUSTICE PETERSEN, opinion of the Court:

### INTRODUCTION

¶1 A jury convicted Ayayai Aziakanou of distribution of or arranging to distribute a controlled substance. Aziakanou, who is African American, alleges that the State violated his right to equal

protection under the law during jury selection when it used a peremptory strike to remove the only person of color from the jury pool. Aziakanou challenged the strike under *Batson v. Kentucky*, 476 U.S. 79 (1986), which prohibits purposeful discrimination during jury selection. But his challenge was denied by the trial court. He now appeals, reiterating his *Batson* challenge and arguing that the evidence supporting his conviction was insufficient. We affirm.

## BACKGROUND[1]

¶2    Two law enforcement officers set up surveillance near Pioneer Park in Salt Lake City. The officers observed "a group of individuals in the park . . . smoking spice."[2] Aziakanou and another man left the group and set up a lawn chair in the park.

¶3    The officers watched as Aziakanou approached a person on the sidewalk and, after a brief discussion, led the person over to his companion on the lawn chair. The person gave the companion money in exchange for a "clear canister[] filled with a green, leafy substance." After the exchange, the person left. The officers did not stop the person who purchased the canister.

¶4    The officers continued to observe Aziakanou and his companion for thirty to forty-five minutes. During that time, the officers observed two more transactions. After the third transaction, "it looked like [the companion] and Aziakanou were gathering their things, as if they were leaving the area." The officers stopped the third buyer and retrieved two canisters, an empty one and the one purchased from Aziakanou's companion containing the leafy green substance.

---

[1] "On appeal from a jury verdict, we view the evidence and all reasonable inferences in the light most favorable to that verdict and recite the facts accordingly. We present conflicting evidence when necessary to provide a full and fair understanding of the issues on appeal." *State v. Scott*, 2020 UT 13, ¶ 5 n.3, 462 P.3d 350 (citation omitted).

[2] Spice is a synthetic cannabinoid. *See Carter v. Lehi City*, 2012 UT 2, ¶ 45 n.33, 269 P.3d 141 (explaining that it is illegal to possess, manufacture, and deal synthetic cannabinoids such as spice in Utah).

¶5     The officers returned to the park and arrested Aziakanou and his companion. They retrieved another empty canister at the park. Both canisters were sent for forensic analysis, which confirmed the leafy substance was spice. The State charged Aziakanou with distribution of or arranging to distribute a controlled substance, a third-degree felony.

¶6     The case was set for a one-day jury trial. During jury selection, the court asked the jury pool if any of them had been "victims of drug cases." Juror 13 raised his hand and said, "Yeah. I'm not sure what you mean by a victim of a drug case. . . . I haven't been—I have been stopped illegally on occasion. . . . For suspicion with the profiling, but other than that . . . no."

¶7     Another question posed by the court during *voir dire*[3] was whether any of the potential jurors would "give a witness who is a law enforcement officer more or less credibility just because they are a police officer." No one indicated that would be a problem. The court then asked whether anyone had "any feelings about your interaction with law enforcement officers that would impact your ability to sit in this case where law officers are witnesses." No one indicated it would affect their ability to serve.

¶8     After the initial questions, only one juror, Juror 23, was struck for cause because he expressed "hate for substance." The court, addressing counsel, inquired about Juror 13, because he "had an addiction, he talked about being profiled."[4] The prosecutor answered, "I thought he'd be one to talk to." Defense counsel agreed, "That's what I was thinking, too. We may want to follow up."

¶9     The court called up Juror 13 for an individual *voir dire*. It first asked Juror 13 to explain his prior reference to "experiences that you've had, and that you felt like you were being profiled."

---

[3] *Voir dire* is the "preliminary examination of a prospective juror by a judge or lawyer to decide whether the prospect is qualified and suitable to serve on a jury." *Voir dire*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[4] Juror 13 did not say he had an addiction. Rather, during *voir dire*, he said he had people in his life, "an uncle, a cousin, a friend, [who] struggled with addiction, but . . . [it] doesn't affect [him] personally."

Juror 13 said, "I would say it's—it's happened more than once. I would have to say at least five times in my lifetime, just being pulled over for—for no reason." When asked where these events occurred, he answered, "It happened a few times here. . . . And then elsewhere, too." The court asked, "[W]hen you say no reason. . .—did they tell you a reason, or did you feel like there was no reason?" Juror 13 responded, "I felt like it was no—there was no reason." He further explained:

> I could tell you one specific time when I was a minor. . . . I was—me and my friends, we were at a party, many of us were at a party at a park, and all of our cars were lined up in the parking lot. As we were leaving the party, everyone got in their cars to leave, as did I, except I was the only person . . . [w]ho got boxed in by the patrol car, so I got chosen, the only Brown person out of everyone else to be singled out . . . and blocked and Breathalyzed for drinking, but I—I mean, I wasn't drinking or doing anything.

Juror 13 then said that was "one experience, and then there's been others, too." In response, the court asked:

> In this case where police are going to testify, where it concerns drug behavior, and undoubtedly at least some kind of interaction between police and a person, and it's obvious that the defendant here is not Caucasian, would that—your experiences impact your ability to sit in this case as a fair and impartial judge?

And Juror 13 responded:

> I don't think so. I think that . . . the presentation from the lawyers would give us the facts, and if the person is guilty, then we will see that they're guilty. If they're innocent, we'll be—we'll see that they're innocent. So I would wait to see what presentation I see before making any decision.

¶10 After concluding the individual *voir dire*, neither party moved the court to remove Juror 13 for cause. Once the jury pool was recongregated in the courtroom, the court inquired, "If you were a party, either as the plaintiff, the prosecutor, or as the defendant, would you be fully satisfied to have your case tried by a person of your present attitude and frame of mind toward this

4

case?" No one raised their hand. The court followed up by asking whether anyone had "any personal considerations or concerns that may interfere with your ability to objectively sit and hear the evidence to be presented, or to fairly and impartially consider the evidence, deliberate, and render a verdict in this case." Again, no one in the pool raised their hand.

¶11 The court then gave the parties the opportunity to use their peremptory challenges and, during a sidebar, the State struck Juror 13. The court then excused the jury pool briefly and defense counsel raised a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), arguing the State's strike of Juror 13 was motivated by discriminatory intent. Defense counsel argued that Juror 13

> explained himself well that there—that, despite those experiences, that he would be able to let the facts stand or fall as they may, and that he would judge what happened or didn't happen based on what he hears in this court. But I think the effect of his removal, and he's, I would note, the only person of color even—well, on the entire panel, but of—that even had a chance of sitting on this jury. I think it's a common experience for people of color to have had such experiences where they feel like they have been singled out without justification, and I think the effect of his removal means that, at least in this case, people of color aren't allowed to sit.

> But there may be some other explanation for the state's decision on that, but it seems that, based on his answers, all of his answers in *voir dire*, that he indicated a willingness to be fair, to listen fairly and impartially, and there were no other responses, I don't think, to any of the questions the Court put to him that would've seemed to have impacted his ability to sit as a juror in this case.

¶12 The court asked defense counsel to elaborate on his argument "as far as the initial showing of some kind of an intent to exclude a particular class of folks." Defense counsel asserted that "our client obviously is . . . African American. He's a person of color. . . . [And] the only person of color potentially to be seated on this jury was excused." Defense counsel noted that while he did not know the reason Juror 13 was excused, he did not "have to supply that reason" to the court. But then defense counsel observed that it seemed as though Juror 13 "was removed because

. . . he had encounters with the police that . . . he considered to be profiling, and he was a person of color."

¶13 The court concluded that defense counsel made "an insufficient showing that is required for the answer." Then the court stated:

> I show that [Juror 13]—and I—no one asked about his nationality, and I can't even tell it from the name, whether he is Hispanic or Middle Eastern. I don't know. But he is darker complected, and clearly of another—not just a Caucasian race. He is the only person, as far as I could tell on the panel, that really seems to be of any other nationality other than Caucasian.

¶14 Although it had determined defense counsel made an insufficient showing to continue the *Batson* inquiry, the court nevertheless asked the State to explain why it struck Juror 13. The prosecutor responded:

> When questioned, I felt like he answered those correctly, so I agree with defense counsel, that's why after initially considering to move for cause, his answers I didn't think—I didn't think had enough to move for cause. But . . . I didn't feel he could be impartial based on some of these things. He stood for when he thought he'd been victimized, he wanted more clarification. He also did refer to profiling. There were some issues where I doubted his ability to try the case and be fair and impartial during the process. He answered the questions correctly. I didn't strike him for cause because I didn't think so. But I can make, based on my observations of him, the way he's interacting, the way he's shaking his head, or nodding, making faces during some of the questions, I didn't—I didn't feel comfortable with him as being a juror.

Defense counsel responded:

> I watched him, too . . . . [I]f there's something specific about his gestures or his face making, or something like that, I didn't notice that . . . . But I think that it's—I don't know that it's a race neutral reason to strike someone who says they think they've been the victim of racial profiling when

they're . . . as he indicated, the only Brown person stopped during that incident he described in the park with his friends as a juvenile, and other times that he's been stopped. . . . I think that's the problem that *Batson* tries to address.

If there's more than that, if he was, like, making sounds, or acting like he generally disagreed, or something like that, . . . I didn't see any of that. I didn't get that at all. But those would've been reasons for cause, I think, if that was the case, but I don't think there's anything demonstrable that he did other than indicate . . . his ability to be fair in this case, and set those things aside, and judge it based on the evidence that's presented.

¶15 The court observed that "the issue rises or falls on this idea of him saying that he felt like he had been stopped in some kind of profiling, and whether or not that amounts to a race neutral explanation." Defense counsel concurred with that statement. The court then asked the prosecutor, "[I]sn't the real thing . . . the statement that [Juror 13] made that he felt like he had been . . . stopped repeatedly, I believe he said about five times for profiling . . . . Was that part of the reasons . . . . [f]or your striking him?"

¶16 The prosecutor answered,

[A]ll my witnesses are law enforcement witnesses. And reading between the lines . . . . I think he has an issue with law enforcement. It's not *Batson*. . . . This is not about his race. This is about his—me believing that he's not going to give law enforcement testimony the same credibility as if Mr. Aziakanou testifies. It's the same thing we do with all jurors, figuring out, you know, we read between the lines.

¶17 Defense counsel countered that it appeared "that the reason being given is the reason that is common to many people of color" and that Juror 13's answers "indicated that he would not hold that against anyone."

¶18 The court then decided:

I am going to overrule the *Batson* challenge, not only because I don't show any evidence of any systemic efforts to exclude any particular set of persons from the panel, but also the explanation I think is race

neutral. Not including what his nationality is or not, the idea that his explanation that he has been repeatedly stopped by the police, and that he feels that that is profiling, I think is sufficient for the state to have been concerned in a case that we have where the police are again going to be . . . an issue.

¶19 Juror 13 was dismissed and the jury was seated. At trial, the State presented as witnesses the two officers involved in the surveillance and arrest of Aziakanou. The officers described the events they observed, including Aziakanou approaching three individuals and leading them to his companion, from whom they purchased spice.

¶20 After the State rested its case, Aziakanou moved for a directed verdict, arguing the State presented insufficient evidence that he intended a drug transaction to occur. The trial court denied the motion, concluding there was enough evidence presented to sustain a conviction. The court explained that "it really is a question of whether or not the jury and reasonable minds could find the defendant guilty of the crime" and that the State presented "specific enough evidence that there was a pattern where the defendant would go out and approach people on the sidewalk, bring them over, they would at least walk together over, and then a drug transaction occurred." The court also noted the "spice found on at least one of the people that were stopped, and some spice containers found in the area where the defendant and his companion were located," supported its denial of the motion. Aziakanou rested without presenting a defense and the jury found him guilty.

¶21 Aziakanou appealed, arguing the trial court erred in denying his *Batson* challenge and his motion for a directed verdict, and the case was poured over to the court of appeals. After briefing and oral argument before the court of appeals, the court certified the case to us.

¶22 We exercise jurisdiction under Utah Code section 78A-3-102(3)(b).

## STANDARDS OF REVIEW

¶23 On appeal, Aziakanou argues the trial court erroneously overruled his *Batson* challenge. A *Batson* challenge involves a three-step inquiry, each with a different standard of review. *Batson v. Kentucky*, 476 U.S. 79, 96–98 (1986) (articulating the three-step inquiry). First, the defendant must "make out a prima facie

case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93–94. A trial court's determination on this point is reviewed under an abuse of discretion standard. *State v. Alvarez*, 872 P.2d 450, 456 (Utah 1994).

¶24 At the second step of a *Batson* challenge, "the burden shifts to the State to come forward with a neutral explanation for challenging [the] jurors." *Batson*, 476 U.S. at 97. This step is reviewed for correctness. *See Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion) (explaining that this determination is "a matter of law").

¶25 Finally, the trial court must "determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98. "[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" because this "finding 'largely will turn on [an] evaluation of credibility.'" *Hernandez*, 500 U.S. at 364–65 (citation omitted). Thus, we will not reverse the "trial court's finding on the issue of discriminatory intent unless [we are] convinced that its determination was clearly erroneous." *Id.* at 369.

¶26 Aziakanou also alleges the trial court erred in denying his motion for a directed verdict based on insufficient evidence. "We review a trial court's ruling on a motion for directed verdict for correctness." *State v. Gonzalez*, 2015 UT 10, ¶ 21, 345 P.3d 1168.

**ANALYSIS**

I. *BATSON* CHALLENGE

¶27 We first address Aziakanou's contention that the trial court erred when it denied his *Batson* challenge. To put Aziakanou's *Batson* argument in context, we draw upon a helpful description of the jury selection process from the United States Supreme Court.

> *First*, a group of citizens in the community is randomly summoned to the courthouse on a particular day for potential jury service. *Second*, a subgroup of those prospective jurors is called into a particular courtroom for a specific case. The prospective jurors are often questioned by the judge, as well as by the prosecutor and defense attorney. During that second phase, the judge may excuse certain prospective jurors based on their answers.

*Third*, the prosecutor and defense attorney may challenge certain prospective jurors. The attorneys may challenge prospective jurors for cause, which usually stems from a potential juror's conflicts of interest or inability to be impartial. In addition to challenges for cause, each side is typically afforded a set number of peremptory challenges or strikes.

*Flowers v. Mississippi*, 139 S. Ct. 2228, 2238 (2019).

¶28 Peremptory strikes "traditionally may be used to remove any potential juror for any reason—no questions asked." *Id.* They have long been used in the United States and date back to the common law. *Id.* But for much of our country's history, "the freedom to exercise peremptory strikes for any reason meant that 'the problem of racial exclusion from jury service' remained 'widespread' and 'deeply entrenched.'" *Id.* at 2239 (citation omitted).

¶29 So in *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court made clear that the use of a peremptory strike based on the race of the potential juror is a violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. The Court established a three-part inquiry to determine whether a peremptory strike was used in a discriminatory manner.[5] *Id.* at 96–98. First, the person challenging the peremptory strike must establish a prima facie case of discrimination. *Id.* at 96. If the challenger meets the prima facie threshold, the burden shifts to the proponent of the strike to provide a facially race-neutral reason for removing the juror. *Id.* at 97. The trial court then must determine whether the challenger of the strike established that it was exercised with a discriminatory purpose. *Id.* at 98. "[T]he burden is, of course, on the defendant who alleges discriminatory

---

[5] *Batson* has since been extended to apply to "defendant[s] of any race," regardless of whether "the defendant and the excluded juror are of different races, . . .to gender discrimination, to a criminal defendant's peremptory strikes, and to civil cases." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019) (citations omitted).

selection of the venire[6] to prove the existence of purposeful discrimination" *Id.* at 92. (citation omitted) (internal quotation marks omitted); *see also State v. Valdez*, 2006 UT 39, ¶ 15 n.10, 140 P.3d 1219 ("[T]he ultimate burden of persuasion in a *Batson* challenge rests with the opponent of the peremptory challenges.").

¶30 Aziakanou's argument focuses almost entirely on step two of the analysis: the requirement that the prosecutor provide a facially race-neutral explanation for the challenged peremptory strike. He asserts that the prosecutor struck Juror 13 because Juror 13 had been racially profiled. And Aziakanou argues that as a matter of law, a potential juror's experience with racial profiling does not qualify as a race-neutral reason for a peremptory strike. He argues that the State therefore violated his right to equal protection under the Fourteenth Amendment. Although Aziakanou focuses on step two, we must address each step of the *Batson* analysis.

*A. Step One*

¶31 A defendant seeking to challenge a peremptory strike based on alleged discrimination must first make a prima facie showing of "purposeful discrimination in selection of the petit jury." *Batson*, 476 U.S. at 96. "The mere fact that the subject of the peremptory strike is a minority member does not establish a prima facie case." *State v. Colwell*, 2000 UT 8, ¶ 18, 994 P.2d 177. But the opponent of a peremptory strike need not prove purposeful discrimination at this point. This initial burden is satisfied by producing "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005).

¶32 After the State used a peremptory strike to remove Juror 13, Aziakanou raised a *Batson* challenge. To make a prima facie showing of discrimination, defense counsel asserted that, "[I]t seem[ed] . . . [Juror 13] was removed because—because he had encounters with the police that maybe were—that he considered to be profiling, and he was a person of color." Counsel emphasized that Juror 13's responses in *voir dire* demonstrated,

---

⁶ A venire is a "panel of persons selected for jury duty and from among whom the jurors are to be chosen." *Venire*, BLACK'S LAW DICTIONARY (11th ed. 2019).

"despite those experiences [with racial profiling], that he would be able to let the facts stand or fall as they may, and that he would judge what happened or didn't happen based on what he hears in this court." He elaborated that "our client obviously is . . . a person of color" and "the only person of color potentially to be seated on this jury was excused."

¶33  The trial court acknowledged that Juror 13 appeared to be the only person of color among the jury pool but determined defense counsel made "an insufficient showing that is required for the answer." Nevertheless, the court then asked the prosecutor for "an explanation."

¶34 Both parties agree that, although the trial court said Aziakanou failed to satisfy step one of *Batson*, the court's step-one determination is rendered moot because the court proceeded to the second step of the inquiry and asked the prosecutor to provide a race-neutral explanation for the strike. *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

¶35  Accordingly, we do not assess whether the court abused its discretion in determining that Aziakanou failed to make a prima facie showing of discrimination sufficient to satisfy step one. However, we emphasize that a defendant need not prove purposeful discrimination at this stage of a *Batson* challenge. It is sufficient to show that the "totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94.

*B. Step Two*

¶36  The core of Aziakanou's argument on appeal is that the trial court erred at step two of the *Batson* analysis because a potential juror's experience with racial profiling is, as a matter of law, not a race-neutral explanation for a peremptory strike.[7]

---

[7] The State argues that the issue Aziakanou raises has already been decided by the United States Supreme Court in *Felkner v. Jackson*, asserting that the Court held that striking a venireperson who may "still harbor[] . . . animosity" toward law enforcement based on experiences of racial profiling was race-neutral. 562 U.S. 594, 595 (2011) (per curiam). We disagree that *Felkner* resolves this

(continued . . .)

However, we disagree with Aziakanou's characterization of the prosecutor's explanation of his peremptory strike. And we agree with the trial court that the prosecutor's proffered reasons were facially race neutral.

¶37 Once the party challenging a peremptory strike makes a prima facie case of discrimination, the proponent of the strike must provide a facially race-neutral reason for the strike. *Hernandez*, 500 U.S. at 358–59. This is "an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 360.

¶38 Step two "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam) (explaining that the proponent's reason may be even "silly or superstitious" at step two, but if it is facially race-neutral, the step-two requirement has been met). And "[t]he explanation given 'need not rise to the level justifying exercise of a challenge for cause.'" *Colwell*, 2000 UT 8, ¶ 22 (quoting *Batson*, 476 U.S. at 97). But it is insufficient for the proponent to "merely

_____

case for two reasons. First, as we will explain, we disagree with Aziakanou's assertion that the prosecutor here struck Juror 13 *because* he had been racially profiled. So we do not decide the case on that basis. And second, it is not clear that *Felkner* directly addressed this question. In *Felkner*, defense counsel raised a *Batson* challenge after the prosecutor struck two Black potential jurors. *Id.* One person was struck because the prosecutor thought the potential juror may "still harbor[] . . . animosity" toward law enforcement because between "the ages of 16 to 30 years old, he was frequently stopped by California police officers because—in his view—of his race and age." *Id.* In its recitation of the facts, the Court characterized this as "a race-neutral explanation." *Id.*

Notably, this language was not part of the court's legal analysis. It appeared only in the recitation of facts. Further, the Court's analysis focused on *Batson* step three, and it does not appear that the defendant raised an argument regarding step two. Accordingly, we do not view *Felkner* as resolving whether a potential juror's prior experience with racial profiling is, *as a matter of law*, a race-neutral reason for a peremptory strike.

13

deny[] that he had a discriminatory motive or . . . merely affirm[] his [or her] good faith." *Purkett*, 514 U.S. at 769.

¶39 In *Hernandez v. New York*, the State struck two Latinos[8] who spoke Spanish from the jury pool. 500 U.S. at 356. Upon a *Batson* challenge, the prosecutor explained that he "fe[lt] very uncertain that they would be able to listen and follow the interpreter" because both "looked away from [him] and said with some hesitancy that they would try, not that they could" accept the court "interpreter as the final arbiter of what was said by each of the [Spanish-speaking] witnesses." *Id.* The Supreme Court accepted this as a race-neutral reason sufficient to satisfy *Batson* step two. *Id.* at 361.

¶40 In accepting this explanation, the Supreme Court explained that "[i]n evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." *Id.* at 359. The Court explained that "[t]he prosecutor's articulated basis for these challenges divided potential jurors into two classes: those whose conduct during *voir dire* would persuade him they might have difficulty in accepting the translator's rendition of Spanish-language testimony and those potential jurors who gave no such reason for doubt." *Id.* at 361. The Court concluded that each class could include both Latinos and non-Latinos. *Id.*

¶41 In *Purkett v. Elem*, the Supreme Court upheld as facially race-neutral the strike of two Black potential jurors because one "had long hair hanging down shoulder length, curly, unkempt hair" and "a mustache and a goatee type beard" and the other also had "a mustache and goatee type beard," which the prosecutor described as "suspicious." 514 U.S. at 766. The Court explained that *Batson*'s "second step . . . does not demand an explanation that is persuasive, or even plausible." *Id.* at 768. It found that the Eighth Circuit "erred by combining *Batson*'s second and third steps into one, requiring that the justification tendered

---

[8] The Supreme Court noted that the parties used the term "Latino" in their briefs to the Court, so the Court used that term "in deference to the terminology preferred by the parties before the Court." *Hernandez v. New York*, 500 U.S. 352, 355 (1991) (plurality opinion).

at the second step be not just neutral but also at least minimally persuasive" because "[i]t is not until the *third* step that the persuasiveness of the justification becomes relevant." *Id.*

¶42 Aziakanou asserts that the State struck Juror 13 because Juror 13 had been racially profiled. And his primary argument on appeal is that this is not a race-neutral explanation "because racial profiling only applies to people of color." However, Aziakanou does not accurately characterize the State's reason for the strike. The prosecutor did not state that he was striking Juror 13 *because* he had been racially profiled. Rather, the prosecutor explained that he struck Juror 13 because he "didn't feel [Juror 13] could be impartial" to the State's law enforcement witnesses. The State gave a number of reasons for this concern, including because Juror 13 had "stood for when he thought he'd been victimized, he wanted more clarification"; he "refer[red] to profiling"; and "the way he's interacting, the way he's shaking his head, or nodding, making faces during some of the questions."

¶43 The trial court then directly asked the prosecutor if he was striking Juror 13 because he had experienced racial profiling. The court asked,

> [I]sn't the real thing . . . the statement that [Juror 13] made that he felt like he had been . . . stopped repeatedly, I believe he said about five times for profiling . . . . Was that part of the reasons . . . . [f]or your striking him?

In response, the prosecutor did not accept the court's characterization, instead answering,

> [A]ll my witnesses are law enforcement witnesses. And reading between the lines . . . . I think he has an issue with law enforcement. It's not *Batson*. . . . This is not about his race. This is about his—me believing that he's not going to give law enforcement testimony the same credibility as if Mr. Aziakanou testifies.

¶44 Thus, the prosecutor's explanation was not that he struck Juror 13 *because* he had experienced racial profiling, but because these prior negative experiences with law enforcement, in combination with Juror 13's demeanor during *voir dire*, caused the prosecutor to believe that Juror 13 had a negative view of the police and may not credit the testimony of the State's law enforcement witnesses. As in *Hernandez*, the prosecutor's

explanation divided the jury pool into two groups: those whose answers and demeanor during *voir dire* caused the prosecutor to believe they had a negative view of law enforcement and would not credit his witnesses' testimony, and those whose answers and demeanor suggested they would be impartial toward (or possibly favor) the State's law enforcement witnesses. *See Hernandez*, 500 U.S. at 361. On its face, this explanation is not based on the race of a prospective juror but on the particular juror's prior experience with and views toward law enforcement. *See id.* at 361. Accordingly, we reject Aziakanou's characterization of the explanation given by the State and his argument that the explanation was not race-neutral as a matter of law.

¶45 To be clear, this is not the end of the *Batson* inquiry. This explanation satisfies step two because on its face, it is "something other than . . . race." *Id.* at 360. However, as we will discuss, if Aziakanou were to show at step three that there were similarly situated white jurors whom the State treated differently—for example, white jurors who described prior negative interactions with the police or indicated a dim view of law enforcement in some way, but were not stricken by the State—that could provide evidence of purposeful discrimination.

¶46 Aziakanou argues that the State did not satisfy step two for two additional reasons. First, he argues that the prosecutor's explanation was not clear, reasonably specific, or legitimate[9]

---

[9] We used similar language in *State v. Cantu*, in which we held that the proponent of a peremptory strike must give an explanation that is "(1) neutral, (2) related to the case being tried, (3) clear and reasonably specific, and (4) legitimate." 778 P.2d 517, 518 (Utah 1989) (citation omitted). Given the Supreme Court's holding in *Purkett v. Elem*, 514 U.S. 765 (1995) (per curiam), the State asks us to clarify these requirements. In *Purkett*, the Supreme Court explained that the "related to the particular case to be tried" requirement "was meant to refute the notion that a prosecutor could satisfy his [or her] burden of production by merely denying that he had a discriminatory motive or by merely affirming his [or her] good faith" and that the "legitimate reason" requirement "is not a reason that makes sense, but a reason that does not deny equal protection." *Id.* at 768–69 (citation omitted). As we are bound by Supreme Court case law related to *Batson* and its progeny, we take the opportunity to clarify that the step two

(continued . . .)

because the prosecutor did not give specific details about Juror 13's body language, defense counsel did not see Juror 13 making faces or gesturing, and the prosecutor did not move to strike Juror 13 for cause. But the Supreme Court has made clear that the explanation given at step two "need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97.

¶47 And questions about the believability or persuasiveness of the State's explanation are not relevant in step two of the *Batson* analysis. The Supreme Court has instructed that when evaluating whether an explanation is race-neutral, a court "assum[es] the proffered reasons for the peremptory challenges are true" and analyzes whether those reasons "violate the Equal Protection Clause as a matter of law." *Hernandez*, 500 U.S. at 359. The Court has explained that "[i]t is not until the *third* step that the persuasiveness of the justification becomes relevant." *Purkett*, 514 U.S. at 768. Accordingly, at step two, we assume the truth of the prosecutor's explanation that he struck Juror 13 because he believed Juror 13 would not be impartial toward the State's witnesses—not because of Juror 13's race, but because of his past negative experiences with law enforcement and demeanor during jury selection.

¶48 Finally, Aziakanou argues that it is "a common experience" for people of color to be subject to racial profiling, and therefore peremptory strikes on this basis disproportionately impact racial minorities. Again, we clarify that we are not holding that it is race-neutral to strike potential jurors *because they have been racially profiled*. We hold only that the explanation given by the State here was race neutral. *See supra* ¶¶ 36–44.

¶49 However, we understand Aziakanou's point more broadly to be that striking jurors for reasons associated with past negative experiences with the police disproportionately impacts racial minorities. For purposes of step two of *Batson*, the Supreme

---

requirement is mere facial validity. It can be absurd, "silly," "superstitious," *id.* at 768, or even "frivolous or utterly nonsensical," *Johnson v. California*, 545 U.S. 162, 171 (2005). Once the proponent of the strike offers a facially race-neutral reason for the strike, the inquiry moves to step three and factors—like whether the explanation is related to the case or if it is legitimate—may become relevant. *Purkett*, 514 U.S. at 769.

Court has held that disparate impact is not determinative. In *Hernandez*, the Court recognized that striking Spanish-speaking jurors "might well result in the disproportionate removal of prospective Latino jurors."500 U.S. at 361. But the Court held that was insufficient to make it a "*per se* violation of the Equal Protection Clause." *Id.* And it explained that while disparate impact should be given "appropriate weight" in assessing discriminatory intent in step three, "it will not be conclusive in the preliminary race-neutrality step of the *Batson* inquiry." *Id.* at 362. The Court has made clear that

> "[d]iscriminatory purpose" . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

*Id.* at 360 (second, third, and fourth alterations in original) (citation omitted).[10]

¶50 Accordingly, we agree with the trial court that the State provided a race-neutral explanation for its peremptory strike of Juror 13. This does not end the *Batson* inquiry. The analysis now proceeds to step three.

### C. Step Three

¶51 Aziakanou next claims that the trial court clearly erred in its determination that he did not prove purposeful discrimination. We disagree.

¶52 At step three of the *Batson* inquiry, the burden shifts back to the party challenging the strike to convince the trial court that, despite the proponent's race-neutral explanation, the proponent struck the potential juror with discriminatory intent. *Batson*, 476 U.S. at 98. At this stage, "[t]he trial court must consider the

---

[10] *See also State v. Sanders*, 933 N.W.2d 670, 679 (Wis. Ct. App. 2019) ("That [two Black venirepersons were struck after they] alleged that their prior experiences with law enforcement may have involved discriminatory intent does not detract from the prosecutor's legitimate, nondiscriminatory concern about potential bias against the State's case in this wholly unrelated proceeding.").

prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties" and then "determine whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race." *Flowers*, 139 S. Ct. at 2243–44. The trial court is afforded great deference in this determination because it is "a pure issue of fact" and "largely will turn on [an] evaluation of credibility." *Hernandez*, 500 U.S. at 364–65 (citation omitted).

¶53 At this step, the court may consider any relevant facts. The Supreme Court recently identified examples of evidence a party raising a *Batson* challenge may rely on:

- statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;

- evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;

- side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;

- a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;

- relevant history of the State's peremptory strikes in past cases; or

- other relevant circumstances that bear upon the issue of racial discrimination.

*Flowers*, 139 S. Ct. at 2243. These enumerated factors are not exhaustive, nor are they required in every case. We also note that even though disparate impact is not dispositive at step two, it is relevant to the trial court's decision at step three. *Hernandez*, 500 U.S. at 363. "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another." *Id.* (alterations in original) (citation omitted). So "[i]f a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a

19

certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination." *Id.*

¶54 Here, the trial court did not explicitly state that it was moving to step three of the analysis—likely because Aziakanou's arguments to the trial court focused entirely on step two. However, the court provided the following reasons for its final decision to overrule Aziakanou's *Batson* objection: (1) there was no evidence of systematic efforts to exclude people of color from the venire, (2) the prosecutor's reasoning was race-neutral, and (3) the prosecutor was justified in being concerned about whether Juror 13 would impartially consider his witnesses' testimony.[11]

¶55 Regarding the first point, we agree with Aziakanou that the trial court erroneously concluded that evidence of a systematic effort to exclude persons of color from the jury pool was necessary. The Supreme Court explicitly rejected this assertion in *Batson*. 476 U.S. at 92–93. A party bringing a *Batson* challenge need not offer proof of systematic efforts of racial discrimination in the use of a peremptory strike. *Id.* at 93–96. They may rely on the facts and circumstances present in the instant case. *Id.* at 95. Accordingly, we do not defer to the trial court's reasoning on this point.

¶56 And the trial court's second reason relates back to step two. Once the prosecutor offered his race-neutral reason for the strike, the analysis should have then focused on whether that facially race-neutral reason was pretextual. However, Aziakanou did not make any such arguments to the trial court or put forth any new facts relevant to the step three analysis, such as those suggested by the Supreme Court in *Flowers*. *See supra* ¶¶ 14–17. Accordingly, the court's reasoning here is a reiteration of its step two analysis, and we do not give it weight with respect to step three.

¶57 We grant deference to the last reason the trial court provided. The court said,

---

[11] It appears the court may have conflated steps two and three of the *Batson* inquiry. Although it is the movant's burden to establish a violation of *Batson*, we emphasize the necessity for trial courts to clearly walk through each step of their analysis for a clear record on appeal.

> Not including what [Juror 13's] nationality is or not, the idea that his explanation that he had been repeatedly stopped by the police, and that he feels that that is profiling, I think is sufficient for the state to have been concerned in a case that we have where the police are again going to be—the question for the stop, what the circumstances are going to be an issue
> . . . .

It appears the court credited the prosecutor's explanation that Juror 13's repeated encounters with law enforcement, considered in conjunction with the nature of the case before it and Juror 13's body language, justifiably caused the prosecutor to worry that Juror 13 would not credit the State's law enforcement witnesses at trial. The court was within its discretion to believe the prosecutor's explanation. *See Hernandez*, 500 U.S. at 369 ("The trial court took a permissible view of the evidence in crediting the prosecutor's explanation."). And the Supreme Court has instructed "that '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" *Id.* (alteration in original) (citation omitted).

¶58 Importantly, Aziakanou did not make arguments to the trial court related to step three, and he has mostly ignored this argument on appeal. Instead, his briefing as to step three reiterates his step-two argument—that the prosecutor's reason for the strike was based on Juror 13's experience being racially profiled, which is not race-neutral as a matter of law. But, as explained above, once the trial court determined the explanation was race-neutral, to prevail on his *Batson* challenge Aziakanou had "an *absolute obligation*" to bring to the trial court evidence of the State's purposeful discrimination. *State v. Harris*, 2012 UT 77, ¶ 17, 289 P.3d 591. He did not. Instead, he argued that a person's experience being racially profiled is not a race-neutral reason for a peremptory strike; in other words, he focused on step two.

¶59 To the extent that Aziakanou has argued that the trial court erroneously applied step three, he focuses on what the State *could* have done: if the prosecutor thought Juror 13 could not remain impartial, "he could have questioned the juror about it"; if Juror 13 had indeed been shaking his head and making faces, the prosecutor could have struck him for cause. But neither option is required to overcome a *Batson* challenge. In fact, the Supreme Court has said just the opposite: the proponent of the strike need not give a reason that rises to the level of a strike for cause. *Batson*,

476 U.S. at 97. And neither party is required to ask specific questions of potential jurors they suspect might harbor bias against their case or witnesses. This is the point of a peremptory strike. To be sure, evidence of disparate questioning of the venire can be relevant to the trial court's step-three analysis. But because the party raising the *Batson* challenge carries the burden of persuasion, it is their duty to bring that evidence to the trial court's attention. Aziakanou did not do so.

¶60 The first time Aziakanou has proffered such an argument is in his reply brief. He argues there that the prosecutor did not *voir dire* a white potential juror who had expressed being "a victim of the [justice] system's treatment of drug crimes." But Aziakanou did not make this argument to the trial court, so that court did not have the opportunity to consider this factual assertion when assessing the prosecutor's explanation. Accordingly, this argument is both unpreserved and waived. *See State v. Johnson*, 2017 UT 76, ¶¶ 15–16, 416 P.3d 443 (explaining that "[w]hen a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue" and that "[w]hen a party fails to raise and argue an issue on appeal, or raises it for the first time in a reply brief, that issue is waived").

¶61 Given the deferential standard with which we must apply the trial court's step-three determination, and the argument and evidence that was before the trial court, Aziakanou has not established that the court clearly erred when it overruled his *Batson* challenge.

## II. SUFFICIENCY OF THE EVIDENCE

¶62 Next, Aziakanou contends the trial court erred when it denied his motion for a directed verdict. He argues the State failed to present evidence that he took active steps in furtherance of arranging to distribute or distributing a controlled substance. Aziakanou claims there was no evidence of statements he made to the buyers about purchasing spice and whether, even if he had the requisite intent, "his conduct 'would, or would be likely to' lead to any kind of distribution." (Citation omitted.) He further claims the evidence against him was "so inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt" that he committed the crime, such that the jury must have "take[n] speculative leaps" to arrive at its verdict. (Citation omitted.) (Internal quotation marks omitted.) We disagree. There was sufficient circumstantial evidence for a jury to

convict Aziakanou of distribution of or arranging to distribute a controlled substance.

¶63 "A conviction not based on substantial reliable evidence cannot stand." *State v. Robbins*, 2009 UT 23, ¶ 14, 210 P.3d 288 (citation omitted). On appeal, we view "the evidence and all reasonable inferences that may fairly be drawn therefrom in the light most favorable to the jury verdict." *Id.* (citation omitted). We will reverse a jury verdict only if "the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *Id.* (citation omitted). And "a conviction can be based on sufficient circumstantial evidence." *State v. Brown*, 948 P.2d 337, 344 (Utah 1997). Where a conviction is based on circumstantial evidence, we must

> determine (1) whether there is any evidence that supports each and every element of the crime charged, and (2) whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove each legal element of the offense beyond a reasonable doubt. A guilty verdict is not legally valid if it is based solely on inferences that give rise to only remote or speculative possibilities of guilt.

*Id.* (citation omitted).

¶64 The jury convicted Aziakanou of distribution of or arranging to distribute a controlled substance, namely, spice. Under Utah law, "it is unlawful for a person to knowingly and intentionally . . . distribute a controlled . . . substance, or to . . . arrange to distribute a controlled . . . substance." UTAH CODE § 58-37-8(1)(a)(ii).

¶65 Aziakanou asserts there was no evidence that he intended a drug transaction to occur. He also argues there was no evidence he made statements to the buyers about purchasing spice. It is true that the State did not offer direct evidence of statements Aziakanou made during the observed transactions. But direct evidence is not required to sustain a conviction. A jury may rely on "all reasonable inferences" that can be drawn from the evidence at trial. *See Robbins*, 2009 UT 23, ¶ 14 (citation omitted).

¶66 The State's only witnesses at trial were the officers who surveilled and arrested Aziakanou. Each officer testified that they observed Aziakanou approach passersby on three separate occasions and lead them to his companion. And both officers testified that Aziakanou watched the transaction that then took place, specifically the exchange of money for canisters of spice. This evidence is not inconclusive or inherently improbable. Rather, from this evidence a reasonable inference can be drawn that Aziakanou sought out buyers and led them to his companion to complete a drug transaction. And this is not a scenario in which it could have been a coincidental, one-off occurrence. The officers watched as Aziakanou repeated the process two more times. It was reasonable for the jury to infer from the circumstances that Aziakanou knowingly or intentionally arranged for the distribution of or distributed a controlled substance. Thus, the trial court did not err in denying his motion for a directed verdict.

## CONCLUSION

¶67 We conclude that the trial court did not err in denying Aziakanou's *Batson* challenge. But we reiterate the importance of a clear analysis of each step of the *Batson* inquiry. We also conclude there was sufficient evidence to support Aziakanou's conviction. Accordingly, we affirm.

¶68 However, although Aziakanou has not prevailed on his *Batson* challenge, he has raised an important issue: that peremptory strikes based on the concern that potential jurors will be biased against law enforcement witnesses due to past negative experiences with the police may lead to the disproportionate removal of persons of color from juries. Yet *Batson* is aimed only at purposeful discrimination. It does not reach peremptory practices that result in the disproportionate removal of racial minorities from juries unless the practice was *intended* to have such a consequence. And it does not address the impact of implicit bias on jury selection. When the Supreme Court decided *Batson*, Justice Marshall concurred, but argued separately that the opinion would not end the discriminatory use of peremptory strikes in part because of the "difficult burden" faced by trial courts in assessing and "second-guess[ing]" the reasons given for a peremptory strike and because the opinion did not reach what Justice Marshall termed "unconscious racism." *Batson v. Kentucky*, 476 U.S. 79, 105–06 (1986) (Marshall, J., concurring).

¶69 The U.S. Supreme Court has observed that discrimination during jury selection not only harms the defendant on trial, but

also those who are denied this opportunity of civic participation. *Id.* at 87. And even where a *Batson* violation has not occurred, the disproportionate removal of racial minorities from juries—whether it is due to peremptory strike criterion that disparately impact persons of color, implicit bias, or some other factor—erodes confidence in the justice system and weakens the very notion of a fair trial by an impartial jury. *Id.* These are important concerns that deserve attention and an earnest search for solutions.[12]

---

[12] We therefore refer this issue to our advisory committee on the rules of criminal procedure. Specifically, the committee should consider whether and how our criminal rules could (1) address the concerns identified in paragraphs sixty-eight through sixty-nine of this opinion and (2) give trial courts guidance in applying *Batson*. We note that other states have addressed these matters through procedural rules or other enactments. *See* WASH. GEN. R. 37; CAL. CIV. PRO. CODE § 231.7 (West 2021); MINN. R. CRIM. P. 26.02(7)(2); *see also State v. Holmes*, 221 A.3d 407, 412 (Conn. 2019) (creating a "Jury Selection Task Force" to consider "measures intended to promote the selection of diverse jury panels"); *State v. Andujar*, 254 A.3d 606, 631(N.J. 2021) (directing a "Judicial Conference on Jury Selection" to convene and "make recommendations for proposed rule changes" to address "the nature of discrimination in the jury selection process"); Sponsor Memo, 2021 N.Y. S.B. 6066 (as before the S. Rules Comm., June 10, 2021) (proposing "[a]n act to repeal section 270.25 of the criminal procedure law" relating to "abolishing peremptory challenges of jurors in criminal cases"). In identifying these rules, we do not intend to express an opinion on their content.

ASSOCIATE CHIEF JUSTICE LEE, concurring
JUSTICE HIMONAS, concurring

ASSOCIATE CHIEF JUSTICE LEE, concurring:

¶70 Justice Himonas raises important questions about a judge's *sua sponte* role in detecting and foreclosing race-based uses of a peremptory challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986). *See infra* ¶¶ 80–84. Such questions, however, are not presented for resolution in a case in which the defendant objected to the prosecution's use of a peremptory strike and we have no briefing on the nature and extent of a judge's *sua sponte* role in this process. This role can better be explored through our rulemaking process.

JUSTICE HIMONAS, concurring:

¶71 Our constitution promises a right not to be excluded from jury service on the basis of race, and it is a right that, in and of itself, protects the legitimacy of our judicial system and promotes the constitutional right of a defendant to an impartial jury. But the right not to be excluded from a jury on account of race is not self-enforcing—it must be enforced. And when it is not enforced, the judicial process is compromised and our justice system becomes complicit in the social inequities of racism.

¶72 I write separately only to drive home the point that trial courts have the power, if not the duty, to raise *Batson* challenges *sua sponte*. Such a challenge serves as a paradigmatic example of where and how trial courts can work to eradicate racism in the courts.

¶73 In a criminal trial, the defendant enjoys a panoply of constitutional protections, including Fourth Amendment rights to freedom from unreasonable search and seizure, Fifth Amendment rights to due process, and Sixth Amendment rights to assistance of counsel and the ability to confront one's accuser. U.S. CONST. amends. IV–VI. Typically, the onus is on defense counsel to raise constitutional challenges on behalf of their clients, and this makes sense—the criminal defendant is the one in the room who stands to lose most when they are, say, precluded from confronting a witness or forced to testify.

¶74 Among a defendant's other constitutional rights is the right to be tried before an impartial jury "drawn from a fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). Supreme Court jurisprudence, including the holding in *Batson v. Kentucky*, 476 U.S. 79 (1986), enforces this right.

¶75   In *Batson* the Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89. But while *Batson* spoke specifically to a *defendant's* Equal Protection rights, it certainly raised the question of whether the potential jurors also enjoyed a right to be free from purposeful discrimination in jury selection.

¶76   The answer is yes, plain and simple.

¶77   In *Powers v. Ohio*, the Supreme Court expanded on its *Batson* holding, ruling that a defendant may object to the race-based exclusion of jurors, regardless of the defendant's own race. 499 U.S. 400, 415–16 (1991). In so doing, the court explained that an individual juror "possess[es] the right not to be excluded from [a jury] on account of race." *Id.* at 409. In rejecting the Ohio Court of Appeals' holding that the challenged juror must be of the same race as the defendant, the Supreme Court stated that *Batson* was "designed to serve multiple ends" and is not limited to situations in which the defendant is harmed by discriminatory removal of jurors of the same race. *Id.* at 406 (quoting *Allen v. Hardy*, 478 U.S. 255, 259 (1986) (per curiam)) (citation omitted) (internal quotation marks omitted). Of these "multiple ends," the Court focused on the following: First, regardless of harm to the defendant, jury service is a valuable right to citizens. As the Court wrote,

> "The jury system postulates a conscious duty of participation in the machinery of justice. . . . One of its greatest benefits is in the security it gives the people that they, as jurors actual or possible, being part of the judicial system of the country can prevent its arbitrary use or abuse."
>
> . . . .
>
> Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process.

*Id.* at 406–07 (first alteration in original) (quoting *Balzac v. Porto Rico*, 258 U.S. 298, 310 (1922)).

¶78   Second, discrimination in jury selection is harmful to the justice system as a whole, and therefore to the defendant. *Id.* at 412–13. "The overt wrong, often apparent to the entire jury panel,

casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause." *Id.* at 412. The Court noted that "[b]oth the excluded juror and the criminal defendant have a common interest in eliminating racial discrimination from the courtroom" and that "[a] venireperson excluded from jury service because of race suffers a profound personal humiliation" and thus "may lose confidence in the court and its verdicts, as may the defendant if his or her objections cannot be heard." *Id.* at 413–14.

¶79 And third, jurors are unlikely to pursue their own rights because they face significant barriers to doing so:

> Potential jurors are not parties to the jury selection process and have no opportunity to be heard at the time of their exclusion. Nor can excluded jurors easily obtain declaratory or injunctive relief when discrimination occurs through an individual prosecutor's exercise of peremptory challenges. . . . [because] it would be difficult for an individual juror to show a likelihood that discrimination against him at the *voir dire* stage will recur. And, there exist considerable practical barriers to suit by the excluded juror because of the small financial stake involved and the economic burdens of litigation.

*Id.* at 414–15 (citations omitted). Ultimately, the court held that these "multiple ends" give a third party (often the defendant) standing to raise a *Batson* challenge on behalf of the juror to vindicate the juror's right to not be excluded on account of race. *Id.* at 406, 415.

¶80 But it isn't just the defendant and the excluded juror who share a "common interest in eliminating racial discrimination from the courtroom"—indeed, the judiciary shares in that interest as well. *See id.* at 413; *id.* at 415 ("The Fourteenth Amendment's mandate that race discrimination be eliminated from all official acts and proceedings of the State is most compelling in the judicial system.") As such, courts also have the ability to raise third-party *Batson* challenges. To this end, states have interpreted the reasoning in *Powers* as justification for *Batson* challenges *sua sponte* by the courts. The Supreme Court of Illinois, for example, cited *Powers* in its holding that a trial court, like a defendant, has standing to raise a *Batson* issue *sua sponte*. *People v. Rivera*, 852 N.E.2d 771, 781–82, 784–85, 791 (Ill. 2006). In addition to the harms

to the defendant and the integrity of the judicial system writ large, as well as the barriers faced by wrongfully excluded jurors in raising a claim of discrimination, the *Rivera* court found that the court has a closer relationship to the jury than does the defendant, thus giving the court third-party standing. *Id.* at 784–85. The *Rivera* court listed several other jurisdictions with consistent holdings, *id.* at 785, including New Jersey, *Hitchman v. Nagy*, 889 A.2d 1066 (N.J. Super. Ct. App. Div. 2006), Michigan, *People v. Bell*, 702 N.W.2d 128 (Mich. 2005), Washington, *State v. Evans*, 998 P.2d 373 (Wash. Ct. App. 2000), Indiana, *Williams v. State*, 669 N.E.2d 1372 (Ind. 1996), Maryland, *Brogden v. State*, 649 A.2d 1196 (Md. Ct. Spec. App. 1994), and Alabama, *Lemley v. State*, 599 So.2d 64 (Ala. Crim. App. 1992). However, the *Rivera* court was also careful to note that raising a *Batson* challenge *sua sponte* is appropriate only when a prima facie case of discrimination is "abundantly clear." *Rivera*, 852 N.E.2d at 785, 791.[13]

---

[13] Additional support for a court's ability to raise *Batson* challenges *sua sponte* comes from the Supreme Court's opinion in *Georgia v. McCollum*, 505 U.S. 42 (1992). There, the Court found that *Batson* challenges may be raised against criminal defendants exercising purposefully discriminatory peremptory challenges because peremptory challenges inherently "perform a traditional function of the government" and thus constitute state action subject to the Equal Protection Clause. *Id.* at 52–55. The Court noted that,

> [a]s the representative of all its citizens, the State is the logical and proper party to assert the invasion of the constitutional rights of the excluded jurors in a criminal trial. Indeed, the Fourteenth Amendment forbids the State to deny persons within its jurisdiction the equal protection of the laws.

*Id.* at 56. And, of course, the "State" to which the *McCollum* Court refers includes the judiciary. Thus, "if a court allows jurors to be excluded because of group bias, '[it] is [a] willing participant in a scheme that could only undermine the very foundation of our system of justice—our citizens' confidence in it.'" *Id.* at 49–50 (alterations in original) (quoting *State v. Alvarado*, 534 A.2d 440, 442 (N.J. Super. Ct. Law Div. 1987)).

¶81 The Supreme Court of Pennsylvania took *Rivera*'s holding even further, suggesting that U.S. Supreme Court dicta may place an affirmative duty on a trial court to raise a *Batson* issue *sua sponte* "after observing a prima facie case of purposeful discrimination by way of peremptory challenges." *Commonwealth v. Carson*, 741 A.2d 686, 695, 696 n.6 (Pa. 1999) (noting, however, that such an affirmative duty may require an extensive record developed at *voir dire* to facilitate appellate review), *abrogated on other grounds by Commonwealth v. Freeman*, 827 A.2d 385 (Pa. 2003).

¶82 And though courts have largely eschewed imposing an affirmative duty on courts to raise a *Batson* challenge *sua sponte* (wrongfully so in my view), the power of a court to do so is, as noted above, clearly recognized.[14]

¶83 Our own Code of Judicial Conduct further cements the power, if not the obligation, of a trial court to raise a *Batson* challenge *sua sponte*. Rule 2.3(C) provides:

> A judge shall take reasonable measures to require lawyers in proceedings before the court to refrain

---

[14] The Supreme Court of Wyoming, for example, noted as recently as this year that "trial judges possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process," even if there is no affirmative duty to raise such an objection. *Yazzie v. State*, 487 P.3d 555, 565 (Wyo. 2021) (quoting *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019)). And in *Flowers v. Mississippi*, the Supreme Court remarked that "the job of enforcing *Batson* rests first and foremost with trial judges. America's trial judges operate at the front lines of American justice. In criminal trials, trial judges possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process." 139 S.Ct. at 2243 (citation omitted). *Flowers* specifically discussed a trial judge's responsibility in terms of "consider[ing] the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances" in ruling on a *Batson* objection. *Id.* However, the "responsibility to enforce *Batson*" certainly encompasses *sua sponte* objections when necessary and appropriate to "prevent racial discrimination" from pervading a trial. *See id.*

> from manifesting bias or prejudice . . . based upon
> attributes including but not limited to race, sex, [or]
> gender . . . against parties, witnesses, lawyers, *or
> others*.

UTAH CODE JUD. CONDUCT 2.3(C) (emphasis added). This rule would require, for example, that a judge appropriately admonish a lawyer for using a racial epithet during a proceeding in order to dispel bias and prejudice from the court room. I find it impossible to imagine that this rule would not apply with equal or greater force to a racially motivated peremptory challenge in which a juror's constitutional right has been violated.

¶84 In sum, given this continuing jurisprudence, I take this time today to remind all of us who toil in Utah's courts of our responsibility to preserve our citizens' confidence in our system of justice. When purposeful discrimination in jury selection is a clear possibility, justice will be best served by a court's *sua sponte* objection. Certainly, raising a *Batson* challenge in the appropriate context won't violate the Utah Code of Judicial Conduct; rather, it will serve to buttress the justice system we judges have sworn an oath to preserve. Going forward, I urge our courts to keep a watchful eye for clear threats to the judiciary's integrity, particularly as they concern peremptory challenges. This commitment will uphold this branch of government while simultaneously dismantling the discriminatory structures that serve only to undermine it.

_____