FILED

05/24/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0379

DA 20-0379

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 95

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

CLAYTON LEE WELLKNOWN,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 19-1182
Honorable Donald L. Harris, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Jeavon C. Lang, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

          Scott D. Twito, Yellowstone County Attorney, Christopher A. Morris,
Deputy County Attorney, Billings, Montana

Submitted on Briefs: March 16, 2022

Decided: May 24, 2022

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Clayton Wellknown appeals a judgment and sentence entered by the Thirteenth Judicial District Court, Yellowstone County, after a jury found him guilty of felony Driving a Motor Vehicle Under the Influence of Alcohol or Drugs in violation of § 61-8-401, MCA (2017) (DUI). Wellknown argues his right to equal protection was violated when the District Court allowed the State to peremptorily strike the only racial minority member of the venire, and that his right to a fair trial was violated by remarks made by the prosecutor during closing argument. He also argues the District Court relied on an unconstitutional prior DUI conviction for enhancement of this DUI conviction to a felony offense. We consider:

> *1. Did the District Court violate Wellknown's right to equal protection by denying his* Batson *objection to the State's peremptory challenge?*
>
> *2. Did the State's remarks during closing argument violate Wellknown's right to a fair trial and necessitate plain error review?*
>
> *3. Did the District Court err when it relied on a prior conviction to support enhancement of Wellknown's DUI conviction to a felony?*

¶2 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On September 22, 2019, the Billings Police Department received 911 calls from multiple citizens regarding a car that was speeding and driving erratically. One of the 911 callers, Ryan Snyder, followed the car to a Double Tree hotel parking lot, and reported the driver's location and physical appearance to law enforcement. Officers found the driver as described, who was Wellknown, in the hotel lobby and arrested him. Wellknown had

2

bloodshot eyes and officers detected the odor of alcohol emanating from him. Officers located an empty 40 oz. bottle of malt liquor on the driver's side floorboard of Wellknown's vehicle. Wellknown did not speak to police, even to identify himself, and by his silence refused to perform field sobriety tests or consent to blood alcohol content (BAC) testing. Police obtained a warrant for a blood draw, indicating Wellknown's BAC was 0.185, or more than twice the legal limit of 0.08, approximately one hour after his arrest. Wellknown was charged with DUI in violation of § 61-8-401, MCA, and, alternately, with a violation of § 61-8-406, MCA (2017) ("DUI *per se*").

¶4 During trial, after the conclusion of voir dire, the State used a peremptory strike to remove Shan Birdinground from the jury. Defense counsel objected, stating "[Birdinground] is the only minority on this jury panel."[1] After this objection, the following exchange occurred:

> **The Court:** Well, I could do an inquiry. . . . [W]hat are the reasons for you to exercise your peremptory against Mr. Birdinground?
>
> **The State:** Your Honor, Mr. Birdinground was the victim in DC 18-0336. He was stabbed multiple times by his partner, [S. D.]. He refused to cooperate. He would never return our phone calls and was hostile to our office. Because of that, we believe he would be a partial juror towards the State [sic] because he was so hostile to us when he was a victim a year and a half ago. We ended up amending that charge from assault with a weapon to criminal endangerment because of his lack of cooperation.
>
> **The Court:** All right. So the objection is overruled. And the State –

---

[1] Though the record does not otherwise address the issue, neither party disputes that Birdinground is Native American.

3

**The State:** *Judge, if I could add a second part.* He also said he would need to – someone to be 100 percent before he would ever convict, which is not the standard.

**Defense Counsel:** Also, just to clarify the record, your Honor, there [were] several jurors that made the same comment 100 percent. The State [hasn't] exercised their peremptory on them *at this point*.

**The Court:** We haven't gotten there yet. They still have some peremptories, right?

**Defense Counsel:** For the purpose [of] perfecting the record.

**The Court:** All right. Thank you.

(Emphasis added.) The District Court then continued with the parties' exercise of peremptory challenges, allowing Mr. Birdinground to be struck from the jury. No further record was made on the issue.

¶5 Snyder and another eyewitness testified to Wellknown's silver Mitsubishi speeding and then crashing off the side of the road, resulting in a flat tire and damage to the vehicle. Despite the flat tire, Wellknown was able to maneuver his vehicle back onto the road and drive for several hundred meters before stopping in the parking lot of a Double Tree hotel. Snyder followed Wellknown in his own vehicle while remaining on the phone with law enforcement and testified that Wellknown got out of his vehicle and walked away, then quickly returned to the vehicle to retrieve a plastic bag and a hat. Wellknown left the hotel parking lot on foot and headed toward a nearby restaurant, while Snyder followed Wellknown in his vehicle. When Wellknown noticed Snyder's lime-green Jeep following him, he turned back to the hotel, entered the hotel lobby, and leaned up against a trash can. Snyder testified he lost sight of Wellknown for a few moments until he spotted Wellknown

4

leaning against the trash can, and said he never observed Wellknown drinking. The responding police officer testified that he arrived at the hotel and found a man matching the description Snyder provided leaning on a trash can in the hotel lobby, and arrested him. Despite Wellknown's refusal to speak, he was identified by identification found on his person. A warrant was issued for a blood draw, which indicated Wellknown's 0.185 BAC.

¶6     Wellknown testified in his own defense, and stated that, after picking up a friend from her job at a fast-food restaurant, he noticed a black SUV behind him and thought he was being followed. He stated that in his attempt to drive away from this pursuer, the SUV swerved in front of him, causing him to overcorrect and crash on the side of the road, popping a tire. Wellknown testified he continued driving to reach an "open area" where he would be safe from his pursuer and, despite his passenger then jumping out of his moving vehicle, proceeded to "a safe spot" where there were "people around," that being the Double Tree parking lot. Wellknown said he left his vehicle but quickly returned to get prescription medication and a pint of liquor he kept in his vehicle. Wellknown stated that he still feared he was being followed, so he headed to a police station on foot, but turned back to the Double Tree when he got scared. He stated he entered the hotel through a side door and made his way toward the lobby, which took a few moments. In the time between entering the hotel and arriving in the lobby—the only time he was not observed by Snyder—Wellknown claimed he drank a "couple shots" of liquor and ingested the retrieved medication. He stated he drank a couple more shots, totaling half of the pint bottle, while standing by the trash can in the lobby. Wellknown stated he disposed of the

5

liquor in the trash can as police approached, and was adamant that the only alcohol he drank that night was the half pint of liquor consumed after he entered the hotel.

¶7      A toxicologist for the State testified at length.  The toxicologist discussed how BAC is determined from a blood sample, the accuracy of determining BAC from a blood sample, and the duration of alcohol in the blood.  He estimated that a person would need to drink at least six shots of 40 percent alcohol by volume liquor, or about half a pint, all at once to reach a BAC of 0.185 within 45 minutes.

¶8      The jury convicted Wellknown of DUI in violation of § 61-8-401, MCA.  Because this was Wellknown's fourth DUI conviction, it was enhanced to felony offense pursuant to § 61-8-731, MCA (2017).  Prior to sentencing, Wellknown challenged a previous 2007 DUI conviction as unconstitutional, and thus ineligible for enhancement purposes.  He claimed he did not know who his attorney was during the 2007 proceeding, was not given any documents regarding his case, lost a right to jury trial by a default bench trial designation, and was convicted in absentia.  The District Court found that Wellknown presented "the barest evidence" of his conviction's invalidity, but that, based on court records, Wellknown was represented by counsel authorized to defend him and was voluntarily absent from the bench trial.  The District Court concluded his 2007 conviction was lawful and sentenced him for felony DUI.

## STANDARDS OF REVIEW

¶9      When considering a challenge based upon *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986), i.e., a challenge claiming that a peremptory strike was used in a

6

discriminatory manner, we "defer to the trial court's findings of fact unless they are clearly erroneous, and [] review the trial court's application of the law de novo." *State v. Warren*, 2019 MT 49, ¶ 16, 395 Mont. 15, 439 P.3d 357 (citing *State v. Ford*, 2001 MT 230, ¶ 7, 306 Mont. 517, 39 P.3d 108).

¶10     We review unpreserved issues alleging violations of fundamental constitutional rights under the plain error doctrine. *State v. Valenzuela*, 2021 MT 244, ¶ 7, 405 Mont. 409, 495 P.3d 1061 (citing *State v. Barrows*, 2018 MT 204, ¶ 8, 392 Mont. 358, 424 P.3d 612). This doctrine is used "sparingly, on a case-by-case basis" in situations "implicating a defendant's fundamental constitutional right[s] and when failure to review the alleged error may result in a manifest miscarriage of justice, leaving unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *State v. Haithcox*, 2019 MT 201, ¶ 23, 397 Mont. 103, 447 P.3d 452 (citing *State v. Aker*, 2013 MT 253, ¶ 21, 371 Mont. 491, 310 P.3d 506).

¶11     Whether a prior conviction can be used for sentence enhancement is reviewed de novo. *State v. Rasmussen*, 2017 MT 259, ¶ 10, 389 Mont. 139, 404 P.3d 719 (citing *State v. Maine*, 2011 MT 90, ¶ 12, 360 Mont. 182, 255 P.3d 64). "However, in determining whether a prior conviction is invalid, a district court may first need to make findings of fact, based on oral and documentary evidence presented by the parties, regarding the circumstances of that conviction. We will not disturb such findings unless they are clearly erroneous." *Rasmussen*, ¶ 10 (citing *Maine*, ¶ 12) (internal citation omitted). "[A] rebuttable presumption of regularity attaches to [a] prior conviction, and we presume that

the convicting court complied with the law in all respects." *Rasmussen*, ¶ 14 (quoting *State v. Krebs*, 2016 MT 288, ¶ 12, 385 Mont. 328, 384 P.3d 98). "[T]he defendant has the burden to overcome the presumption of regularity by producing affirmative evidence and persuading the court, by a preponderance of the evidence, that the prior conviction is constitutionally infirm." *Rasmussen*, ¶ 14 (quoting *State v. Chaussee*, 2011 MT 203, ¶ 13, 361 Mont. 433, 259 P.3d 78).

**DISCUSSION**

¶12     *1. Did the District Court violate Wellknown's right to equal protection by denying his* Batson *objection to the State's peremptory challenge?*

¶13     "The use of peremptory challenges to remove prospective jurors on the basis of race is unconstitutional under the Equal Protection Clause of the United States and Montana constitutions." *Warren*, ¶ 33 (citing U.S. Const. amend. XIV, § 1; Mont. Const. art. II, § 4; *Batson*, 476 U.S. at 89, 106 S. Ct. at 1719; *State v. Ford*, 2001 MT 230, ¶¶ 9-10, 306 Mont. 517, 39 P.3d 108). The alleged racial discrimination must be purposeful, which is determined by applying a three-part test this Court adopted from *Batson*. *Ford*, ¶ 16 (citing *Batson*, 476 U.S. at 97-98, 106 S. Ct. at 1723-24). First, the party objecting to the peremptory strike must make out a prima facie showing of purposeful discrimination. *Warren*, ¶ 34 (citing *Batson*, 476 U.S. at 93, 106 S. Ct. at 1721; *Ford*, ¶ 16). A prima facie showing requires a showing that, under the facts of the case, the striking party had a racially-motivated reason for striking the juror, and the objecting party may provide "any other relevant facts and circumstance creating an inference that the proponent used the

8

peremptory jury selection practice to exclude members of the jury panel discriminatorily." *Warren*, ¶ 34 (citations omitted).

¶14 Second, if a prima facie showing is made, "the burden of production shifts to the proponent of the strike to provide a neutral explanation for the strike." *Warren*, ¶ 34 (citing *Batson*, 476 U.S. at 97, 106 S. Ct. at 1723; *Powers v. Ohio*, 499 U.S. 400, 409, 111 S. Ct. 1364, 1369-70, (1991); *Ford*, ¶ 16). If discriminatory intent is not inherent in the proffered explanation, it will be deemed to be race-neutral. *Warren*, ¶ 34 (citation omitted). The opponent of the strike "may respond to the proponent's neutral explanation to demonstrate the proffered reason is pretextual." *Warren*, ¶ 34 (citing *Batson*, 476 U.S. at 98, 106 S. Ct. at 1724).

¶15 Finally, the "trial court must determine whether the opponent of the strike has established purposeful discrimination." *Warren*, ¶ 34 (citing *Batson*, 476 U.S. at 98, 106 S. Ct. at 1724; *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771 (1995)). This determination lies within the trial court's fact-finding discretion, and we will not disturb it absent "exceptional circumstances." *See State v. Miller*, 2022 MT 92, ¶ 16, ___ Mont. ___, ___ P.3d ___ (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 1208 (2008); *Ford*, ¶ 18). "A credible race neutral explanation generally refutes the earlier inference of purposeful discrimination while an incredible, implausible, fantastic, or pretextual explanation strengthens and confirms" the initial prima facie showing. *Miller*, ¶ 16 (citing *Snyder*, 552 U.S. at 484-85, 128 S. Ct. at 1212). Because a *Batson* objection involves a trial court's detailed analysis of both parties' arguments and explanations, we

9

"once again" admonish trial courts and attorneys to provide a clear record for appellate review. *Miller*, ¶ 13, n.4 (collecting cases).

¶16    While the trial court provided only a truncated *Batson* analysis, and the attorneys did not suggest otherwise, we conclude the record provides a sufficient basis for review. *Warren*, ¶ 39.    Under the first step, the District Court did not explicitly state that Wellknown made out a prima facie showing of purposeful discrimination, but it is apparent the court so concluded by moving to the second step and requiring the State to provide its explanation for the strike.    The parties do not disagree that Birdinground was the only minority member of the jury panel.    We held in *Warren* that the Defendant satisfied his burden by showing the State had struck "the only Hispanic juror on the panel."  *Warren*, ¶ 35.    Thus, the burden of production shifted to the State to provide a race-neutral explanation for the strike. *Warren*, ¶ 35.

¶17    In response, the State offered that Juror Birdinground, a victim in a prior domestic violence case, had been uncooperative in the prosecution of the offender, and "hostile" to the county attorney's office, which resulted in the office resolving the case against the offender by reducing the charges.  Although a race-neutral reason, the State provided no information that either of the attorneys prosecuting Wellknown were involved in the prosecution against Birdinground's attacker, only that it was handled by their office, no evidence or description of Birdinground's "hostile" behavior beyond not returning phone calls, and only a general statement that he had refused to cooperate.  When the District Court began to overrule Wellknown's objection, the State interrupted the court to offer a

10

further reason for its strike—that during voir dire Birdinground had answered regarding the burden of proof that he would need to be "100 percent" sure before he could convict someone, which, as the State stated, "is not the standard." The defense then offered to "clarify the record" that other jurors had offered the same comment about the burden of proof and the State had not struck them "at this point," but did not otherwise attempt to directly rebut the State's explanations as merely pretextual. The District Court stated, "[w]e haven't gotten there yet," and permitted the strike. No further objections were made.

¶18 To the extent the defense was arguing the State's explanations were pretextual, no mention was made of the State's first proffered reason. As to the State's second reason, the defense noted only that other jurors who had given the same answer during voir dire had not been struck "at this point." Ultimately, the State did strike other jurors who had provided the same answer—and one such juror before the strike of Birdinground—and it appears one juror who gave that answer remained on the jury. All considered, this record is sufficient to support the District Court's ruling that the State's race-neutral explanation was not pretextual. *See Warren*, ¶ 39 (Court affirmed the district court's approval of the State's race-neutral explanation that it was striking jurors it did not have a chance to question where the State exercised other peremptory challenges consistent with its explanation, but one juror not questioned by the State or defense served on the jury.).

11

¶19    Despite the abridged *Batson* analysis, the record as a whole is sufficient to conclude the District Court's ruling on the objection was not error.[2]

¶20    *2. Did the State's remarks during closing argument violate Wellknown's right to a fair trial and necessitate plain error review?*

¶21    Wellknown argues that comments by the prosecutor during closing argument violated his right to a fair trial.  Because Wellknown did not object, the issue must qualify for review under the plain error doctrine.  *See Valenzuela*, ¶ 7 ("Unpreserved issues alleging violations of fundamental constitutional right are reviewable under the common law plain error doctrine.").

¶22    "The right to a fair trial by jury is guaranteed by the Sixth Amendment to the United States Constitution and by Article II, Section 24, of the Montana Constitution."  *State v. Smith*, 2021 MT 148, ¶ 42, 404 Mont. 245, 488 P.3d 531 (citing *Aker*, ¶ 24).  A conviction is subject to reversal when a prosecutor's conduct "deprives the defendant of a fair and impartial trial."  *Smith*, ¶ 42 (quoting *Aker*, ¶ 24).  "We review alleged improper statements during a closing argument in the context of the entire argument; we do not presume prejudice from the alleged misconduct, and the burden is on the defendant to show the argument violated his substantial rights."  *Smith*, ¶ 42 (citing *Aker*, ¶ 24).  "A fundamental principle of our criminal justice system is that the State prove every element of a charged

[2] Wellknown's appellate argument urges the Court to construe the dignity and trial clauses of the Montana Constitution to more broadly prohibit peremptory strikes that are the product of "unconscious bias."  However, as the State argues, this alternative analytical framework was not offered in the District Court and preserved for appeal, and we conclude it is unnecessary that we reach the issue here in order to prevent a miscarriage of justice or ensure the fundamental fairness of this proceeding.

offense beyond a reasonable doubt." *State v. Favel*, 2015 MT 336, ¶ 25, 381 Mont. 472, 362 P.3d 1126 (quoting *State v. Daniels*, 2011 MT 278, ¶ 33, 362 Mont. 426, 265 P.3d 623). To that end, the Due Process Clause requires a conviction to be based upon "proof beyond a reasonable doubt of every fact necessary to constitute the [charged] crime." *Favel*, ¶ 25 (quoting *In re Winship*, 397 U.S. 358, 363-64, 90 S. Ct. 1068, 1072-73 (1970)).

¶23 Wellknown contends the prosecutor "harped" on or over-emphasized his refusal to perform field sobriety tests by stating Wellknown "was given every opportunity to perform field sobriety maneuvers to communicate with [law enforcement] to show that he is not [under the influence of alcohol]," and that Wellknown "chose not to do those. *He chose not to show the officers that he was not under the influence*." Wellknown argues these comments shifted the presumption of innocence and implied Wellknown had an obligation to exonerate himself. He compares these comments to those in *State v. Favel*, where the prosecutor argued the defendant could have "proven her innocence" by submitting to a breath test during a DUI investigation. *Favel*, ¶ 26. This Court concluded the comments were improper because they conveyed "that if Favel were innocent she would have proven her innocence by submitting to a breath test." *Favel*, ¶ 26.[3]

---

[3] The comments made by the prosecutor in *Favel* were an apparent attempt to reinforce to the jury that, pursuant to § 61-8-404(2), MCA (2011), the jury could infer from the defendant's refusal to take a breath test that she was intoxicated. *Favel*, ¶ 26. Here, soon after making the comments regarding the standardized field sobriety tests, the prosecutor also mentioned Wellknown's refusal to take a breath or blood test and the inference the jury could draw from *that* refusal, pursuant to § 61-8-404(2), MCA. Contrary to the State's position, Wellknown is not arguing here that the prosecutor's comments regarding the § 61-8-404(2), MCA, inference were improper, but that the comments regarding Wellknown's refusal to perform field sobriety tests on their own improperly shifted the burden of proof. The language of § 61-8-404(2), MCA, permits the inference of intoxication to extend only to breath or blood tests refused pursuant to § 61-8-402, MCA.

¶24 The State responds that, unlike in *Favel*, the prosecutor here did not use the term "innocence," and did not argue Wellknown was guilty because he "could have proven" his innocence. However, we conclude the State's distinction is unpersuasive. Despite not using the term "innocence," the prosecutor substituted an element of the charged crime "under the influence"—for that concept, and implied that the onus was on Wellknown to demonstrate he was not under the influence of alcohol. While not identical to the prosecutor's remarks in *Favel*, the remarks here were similarly improper, because "the risk is simply too great that the State's burden of proof in the mind of a juror will be diminished by the repeated use of burden of proof language—such as demonstrate, *show*, and prove— in reference to what the defendant could have done." *Favel*, ¶ 26 (emphasis added).

¶25 However, as in *Favel*, we conclude the comments do not rise to a level necessitating plain error review. The District Court correctly instructed the jury on the burden of proof, and we presume the jury followed the instructions. *Smith*, ¶ 49 (citing *State v. Ariegwe*, 2007 MT 204, ¶ 168, 338 Mont. 442, 167 P.3d 815). The State introduced evidence demonstrating Wellknown's BAC was more than twice the legal limit an hour after his arrest, that an empty bottle of malt liquor was found by his vehicle's driver's seat, and that multiple witnesses saw Wellknown driving in a dangerous and erratic manner immediately before his arrest. Wellknown has not demonstrated that failure to exercise plain error review will "result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of [the] trial, or comprise the integrity of the judicial process." *Favel*, ¶ 29.

14

¶26     Wellknown next argues the prosecutor's comments on reasonable doubt misstated the law by utilizing "disfavored" formulations. Wellknown points to the following statement the prosecutor made during his rebuttal:

> Hopefully none of you have had to make a decision to have a loved one['s] limb removed. Pretty rare, isn't it? How about the decision to terminate someone's life? It happens. So[me] of us have made that. But, again, rare. Doesn't say that is the standard. What it says most important of your affairs.
>
> What big decision have you made in life? Depending on where you are in life, if you are 19 years old, it is possible which college to go to. That is a pretty big decision. If you are a little older, might be to get married. Who are you going to settle down with? Little older, it could be kids, jobs. Major decisions.
>
> All of you have made those decisions and you typically make them every year. This is not pulling off life support. It is most important of your affairs. What are the important things in your life? What decisions have you made? That's what you look at.

¶27     The jury instructions, which are not challenged, defined reasonable doubt as "proof of such a convincing character that a reasonable person would rely and act upon in the most important of his or her own affairs." The prosecutor's analogies were made in rebuttal after defense counsel had cited the reasonable doubt instruction and similarly analogized, both in voir dire and again in closing argument, to the certainty one would need to decide to amputate a loved one's limb or make some other major life decision. Thus, the prosecutor was arguing an analogy first offered by the defense. The prosecutor's comments were at times unclear, but did not misstate the law. Wellknown's authority for "disfavored" allegories is thin, and has failed to demonstrate that the Court's failure to exercise plain error review here would result in "a manifest miscarriage of justice, leaving

15

unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *Haithcox*, ¶ 23.

¶28 Finally, Wellknown argues the prosecutor's closing argument invaded the province of the jury by vouching for the credibility of Witness Snyder by stating Snyder "[d]oesn't know any of these people. Got drug out of work to come here and test[ify]. No bias. No motive. And no prejudice of any kind," and by expressing his personal belief that Wellknown was guilty by stating "that [is] what he is."

¶29 The prosecutor's comments about Snyder's lack of bias were made in the context of discussing the jury's duty to determine witness credibility. Immediately prior to this comment, the prosecutor stated: "You get to look as jurors at what motive someone has, their bias or their specific prejudice in a case. You get to consider that . . . . Pause for a second, think about who has any of that in this case. Let's start with [Snyder]." In the context of the argument, the prosecutor was referencing permissible inferences of bias, or lack thereof, that the jury could draw from the testimony. A prosecutor properly may comment on such inferences. *See Smith*, ¶ 47 (citing *State v. McDonald*, 2013 MT 97, ¶ 14, 369 Mont. 483, 299 P.3d 799).

¶30 The "that [is] what he is" comment was in reference to Wellknown's alleged guilt of either one of the charges presented to the jury, DUI and DUI *per se,* and how the jury could convict him of one or the other, but not both. The statement was made at the conclusion of the prosecutor's argument, after arguing why the evidence supported a guilty verdict. Unlike in *State v. Gladue*, 1999 MT 1, 293 Mont. 1, 972 P.2d 827, where the

16

prosecutor offered his personal opinion about the defendant's guilt by stating, "It's my job to evaluate cases and decide which ones will fly and which ones won't. This one flies . . . more than most cases we bring," the prosecutor's statement here did not offer his personal opinion of guilt, or an argument based on his personal authority. *See Gladue*, ¶¶ 20-22. Read in context, this is a proper comment on the "inferences the jury should draw from the evidence"—here, the inference of guilt. *See Smith*, ¶ 47 (citation omitted).

¶31 Wellknown argues the totality of these alleged errors warrants reversal under the cumulative error doctrine, under which a conviction may be reversed "where numerous errors, when taken together, have prejudiced the defendant's right to a fair trial." *State v. Cunningham*, 2018 MT 56, ¶ 32, 390 Mont. 408, 414 P.3d 289 (quoting *State v. Hardman*, 2012 MT 70, ¶ 35, 364 Mont. 361, 276 P.3d 839). Having found error in only one of the prosecutor's remarks, cumulative error does not require reversal. *See Hardman*, ¶ 35.

¶32 *3. Did the District Court err when it relied on a prior conviction to support enhancement of Wellknown's DUI conviction to a felony?*

¶33 Wellknown argues the District Court erred by ruling his 2007 DUI conviction was not constitutionally infirm for purposes of enhancement of his current conviction. "A constitutionally infirm prior conviction used for enhancement purposes constitutes 'misinformation of constitutional magnitude'" by violating the defendant's right to due process. *Maine*, ¶ 28 (quoting *United States v. Tucker*, 404 U.S. 443, 447, 92 S. Ct. 589, 592 (1972); citing *State v. Phillips*, 2007 MT 117, ¶ 17, 337 Mont. 248, 159 P.3d 1078; Mont. Const. art. II, § 17). This Court employs the following framework to determine whether a prior conviction may be used to enhance punishment on a current charge:

> (1) a rebuttable presumption of regularity attaches to the prior conviction, (2) the defendant has the initial burden to produce direct evidence that the prior conviction is invalid, and (3) once the defendant has made this showing, the burden shifts to the State to produce direct evidence and prove by a preponderance of the evidence that the prior conviction was not entered in violation of the defendant's rights.[4]

*Maine*, ¶ 13 (citing *State v. Okland*, 283 Mont. 10, 18, 941 P.2d 431, 436 (1997)). The defendant's burden to demonstrate a prior conviction's invalidity is a "heavy" one which must be met "with affirmative evidence." *Maine*, ¶ 17. "[T]o meet his or her burden of proof, the defendant may not simply point to an ambiguous or silent record, but must come forward with affirmative evidence . . . [s]elf-serving statements by the defendant that his or her conviction is infirm are insufficient to overcome the presumption of regularity." *Maine*, ¶ 34.

¶34 Wellknown challenges his 2007 DUI conviction as infirm because the Justice Court "imposed a forced waiver" of his right to a jury trial in that case by using a stock form addressing dates for the omnibus hearing and trial that "automatically" set the case for bench trial and placed a burden upon Wellknown to request a jury trial. The form, entitled "Order Setting Conditions of Bond, Omnibus Hearing and Trial" (Omnibus Order), advised Wellknown that attendance at the omnibus hearing and trial were mandatory and that he may demand a jury trial at the omnibus hearing. In the meantime, the Omnibus Order set

---

[4] Despite referencing this standard in his briefing, at various points Wellknown argues that "[t]he burden shifted to the State to prove that the conviction was valid" and "[t]he State failed to provide evidence to prove the conviction was validly obtained." However, this Court clarified in *Maine* that the ultimate burden of proof remains with the defendant, who must "prove by a preponderance of the evidence that the conviction is *invalid*." *Maine*, ¶ 34. "The burden is not on *the State* to prove by a preponderance of the evidence the conviction is *valid*." *Maine*, ¶ 34.

a bench trial and advised Wellknown that it would be conducted in his absence if he failed to appear for trial. Wellknown claims he was never given a copy of the Omnibus Order, or any other court document, after he was released from jail, and was never mailed any document in his case. Wellknown claims he never met with his public defender and did not know the date of his bench trial. Thus, Wellknown argues that when he subsequently failed to appear for his trial, the public defender had no authority to proceed with the bench trial in his absence.

¶35 After Wellknown testified at the sentencing hearing, the State introduced documents relating to his 2007 DUI case, including the Omnibus Order and Sentence. Ruling from the bench, the District Court concluded that Wellknown's testimony—including that he had little recollection of what happened in 2007 and did not remember meeting his appointed counsel—"barely" established evidence of invalidity. On the whole record, the District Court found from the Justice Court records, including bench notes, that Wellknown had counsel present who was authorized to proceed in Wellknown's absence. The District Court concluded that Wellknown was asking the court to "speculat[e] . . . that the public defender would not have done what any competent public defender would have done at the time had he lost all contact with the Defendant . . . [and] ask for a continuance."

¶36 Regarding Wellknown's knowledge of the trial date, the District Court stated it had "no reason to believe that based upon this record [Wellknown] didn't have knowledge of the omnibus hearing and trial date" because the Omnibus Order—which Wellknown

19

signed—informed him the trial was set for June 12, 2007.[5] The Omnibus Order likewise informed Wellknown of his right to a jury trial: "The defendant may demand a jury trial. Trial will be held in absence of defendant upon defendant's failure to appear for trial" and, just above the signature line, Wellknown acknowledged: "I understand that my attendance at the omnibus hearing and trial is mandatory. I understand my right to a jury trial. I will make a timely demand for a jury trial." Based on the certified court records, and that Wellknown's arguments almost wholly stem from ambiguities or silence in the record, we conclude the District Court's findings regarding Wellknown's 2007 conviction are not clearly erroneous, *Rasmussen*, ¶ 10, and conclude the District Court correctly determined that Wellknown's 2007 DUI conviction was constitutionally valid.[6]

¶37     Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON

---

[5] Wellknown argues the hand-written trial date is illegible and could be read as June 12, 17, or 19. However, not only was this argument not made during the sentencing hearing, but the record reflects that, on cross-examination, Wellknown acknowledged the Omnibus Order states the trial was set for June 12, 2007.

[6] Wellknown also argues that § 46-16-122, MCA, does not adequately safeguard a defendant's right to be present at trial and is therefore unconstitutional as applied to stacking misdemeanors that could result in a felony conviction. This argument is presented for the first time on appeal; we therefore decline to address it. *See State v. Strizich*, 2021 MT 306, ¶ 32, 406 Mont. 391, 499 P.3d 575.

Justice Beth Baker, concurring.

¶38    I agree that Wellknown's *Batson* claim must fail under our existing analytical framework for reviewing such challenges.  I write separately, however, because I agree with Wellknown's argument that the Montana Constitution should afford greater protection against discriminatory peremptory challenges.  In my view, we should revisit Montana's approach to equal protection in the jury selection context, consistent with the Montana Constitution and with society's improved understanding of implicit bias.

¶39    Article II, Section 26, of the Montana Constitution provides: "The dignity of the human being is inviolable.  No person shall be denied the equal protection of the laws." Our "Equal Protection Clause 'provides even more individual protection than the Equal Protection Clause in the Fourteenth Amendment of the United States Constitution.'" *A.W.S. v. A.W.*, 2014 MT 322, ¶ 11, 377 Mont. 234, 339 P.3d 414 (*quoting Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶ 15, 325 Mont. 148, 104 P.3d 445); *Ferrier v. Teacher's Ret. Bd.*, 2005 MT 229, ¶ 14, 328 Mont. 375, 120 P.3d 390 (*citing Cottrill v. Cottrill Sodding Serv.*, 229 Mont. 40, 42, 744 P.2d 895, 897 (1987)).  And we have read the Dignity Clause together with other fundamental rights to provide Montana citizens with greater protections than what the federal constitution guarantees.  *See Wilson v. State*, 2010 MT 278, ¶ 31, 358 Mont. 438, 249 P.3d 28; *Walker v. State*, 2003 MT 134, ¶ 73, 316 Mont. 103, 68 P.3d 872.

¶40    Montana's Equal Protection and Dignity Clauses provide bases for strengthening Montana's *Batson* framework.    The 1972 Constitutional Convention transcripts

21

demonstrate the link between these two clauses: "The intent of Section 4 is simply to provide that every individual in the State of Montana, as a citizen of this state, may pursue his inalienable rights without having any shadows cast upon his dignity through unwarranted discrimination." 5 Mont. Constitutional Convention Transcripts 1642 (1972). The Constitutional Convention Commission's Bill of Rights Study indicates that "dignity," in the context of the Montana Constitution, refers to the "inalienable rights [ ]that inhere in individual persons as a matter of moral right prior to the formation of a state, and may not, therefore, be taken away by the state[.]" Matthew O. Clifford, Thomas P. Huff, *Some Thoughts on the Meaning and Scope of the Montana Constitution's "Dignity" Clause with Possible Applications*, 61 Mont. L. Rev. 301, 318 (2000) [hereinafter *Meaning and Scope*].

¶41 But the study suggested another conception of dignity as well. The study specifically noted that the State could "go beyond the federal Fourteenth Amendment." *Meaning and Scope*, 61 Mont. L. Rev. at 320. It pointed to "the lack of strong federal enforcement of civil rights and the need for protection against discrimination for . . . [among other persons] Native Americans." *Meaning and Scope*, 61 Mont. L. Rev. at 320. "[T]his part of the Commission's study," Clifford and Huff argue, "suggests . . . a concern for harms to dignity associated with the distinctive forms of degrading, discriminatory treatment suffered by [women, disabled persons, and Native Americans]." *Meaning and Scope*, 61 Mont. L. Rev. at 320.

¶42 "[A] person's dignity vitally depends on recognition by others in the political and social community." Neomi Rao, *Three Concepts of Dignity in Constitutional Law,*

86 Notre Dame L. Rev. 183, 248 (2011) [hereinafter *Three Concepts of Dignity*]. When considering dignity in the context of racial equality issues,

> this dignity may rest upon the intrinsic worth of the individual, the idea that each person must be treated as an individual, rather than as a member of a group based on immutable characteristics such as race or gender. Racial equality cases, however, also sometimes focus on the dignity of recognition, on the necessity of full inclusion in the social and political community.

*Three Concepts of Dignity*, 86 Notre Dame L. Rev. at 262. The Constitutional Convention's Bill of Rights Study echoed this concept when it stated: "It can be argued that Montana, with a significant and, culturally speaking, priceless minority population, is especially suited to the adoption of strong anti-discrimination provisions enforceable by those affected." *Meaning and Scope*, 61 Mont. L. Rev. at 320 (quoting Montana Constitutional Convention 1971-1972, Study No. 10: Bill of Rights, at 312).

¶43　This recognition of difference, of acceptance into the social and political community, is at the core of equal protection in the jury selection context. "The very idea of a jury is a body composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of . . . persons having the same legal status in society as that which he holds." *Batson*, 476 U.S. at 86, 106 S. Ct. at 1717 (internal ellipses omitted). Discriminatory jury selection harms not only the defendant in a criminal proceeding—it also harms the excluded juror and the entire community. *Batson*, 476 U.S. at 87, 106 S. Ct. at 1718. When a lawyer strikes a juror on account of the juror's race, it sends a message to the defendant, the juror, and everyone else who identifies with the race of the excluded juror, that they are not accepted into the political community. *See also*

23

*State v. Miller*, 2022 MT 92, ¶ 46, 408 Mont. 316, ___ P.3d ___ (McKinnon, J., concurring) (noting that when jurors are "singled out by the color of their skin" it is "an assertion of their inferiority and a stimulant to . . . race prejudice") (quoting *Strauder v. West Virginia*, 100 U.S. 303, 308 (1879)). Discrimination in the jury selection process, therefore, constitutes a dignitary harm. *See also North Carolina v. Clegg*, 867 S.E.2d 885, 915 (N.C. 2022) (Earls, J., concurring) ("When racial bias infects jury selection, it is an affront to individual dignity and removes important voices from the justice system."). Given our recognition of the greater protections Montanans have under the state constitution's Dignity and Equal Protection Clauses, I would suggest that the Montana Constitution affords greater protection against discriminatory peremptory challenges than what the traditional *Batson* analysis offers.

¶44 Many judicial and academic commentators agree that the *Batson* framework fails to remedy the discriminatory use of peremptory challenges.[1] Because *Batson* prohibits only

---

[1] *Miller-El v. Dretke*, 545 U.S. 231, 270, 125 S. Ct. 2317, 2342 (2005) (Breyer, J., concurring) ("[T]he use of race- and gender-based stereotypes in the jury-selection process seems better organized and more systematized than ever before."); *Clegg*, 867 S.E.2d at 917 (Earls, J., concurring); *Utah v. Aziakanou*, 498 P.3d 391, 406-07 (Utah 2021); *New Jersey v. Andujar*, 254 A.3d 606, 622-23 (N.J. 2021); *Connecticut v. Holmes*, 221 A.3d 407, 429 (Conn. 2019); *Washington v. Jefferson*, 429 P.3d 467, 475 (Wash. 2018); *see also* Annie Sloan, *"What to do About* Batson*?" Using a Court Rule to Address Implicit Bias in Jury Selection*, 108 Calif. L. Rev. 233, 235 (2020); Jonathan Abel, Batson*'s Appellate Appeal and Trial Tribulations*, 118 Colum. L. Rev. 713, 717 (2018); Jeffrey Bellin & Junichi P. Semitsu, *Widening* Batson*'s Net to Ensnare More than the Unapologetically Bigoted or Painfully Unimaginative Attorney*, 96 Cornell L. Rev. 1075, 1093 (2011); Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson*, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 150 (2010); Antony Page, Batson*'s Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge*, 85 B.U. L. Rev. 155, 179-80 (2005); David C. Baldus et al., *The Use of Peremptory Challenges in Capital Murder Trials: A Legal and*

purposeful discrimination, (1) it fails to account for instances of implicit bias, which are not necessarily "purposeful"; and (2) a party easily may articulate a race-neutral justification for exercising a peremptory strike, even when the discrimination is purposeful. *See Hernandez v. New York*, 500 U.S. 352, 360, 111 S. Ct. 1859, 1866 (1991) ("Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral."); *Batson*, 476 U.S. at 93, 106 S. Ct. at 1721; *Jefferson*, 429 P.3d at 476. It is, therefore, very difficult for a criminal defendant to prove that an exercise of a peremptory challenge violated the defendant's equal protection guarantee, despite studies indicating that discrimination continues to taint the jury selection process. *See Race and the Jury: Illegal Discrimination in Jury Selection*, Equal Justice Initiative 41 (2021).[2] Wellknown points out that this disparity may be particularly problematic in Montana, considering the disproportionate rate of Native American incarceration. *See generally* A Brief from the Montana Advisory Committee, *Bordertown Discrimination in Montana* (2019).[3]

---

*Empirical Analysis*, 3 U. Pa. J. Const. L. 3, 54 (2001); Leonard L. Cavise, *The* Batson *Failure to Meet the Challenge of Discrimination in Jury Selection*, 1999 Wis. L. Rev. 501, 501 (1999); Andrew G. Gordon, *Beyond* Batson v. Kentucky*: A Proposed Ethical Rule Prohibiting Racial Discrimination in Jury Selection*, 62 Fordham L. Rev. 685, 693-94 (1993); Karen M. Bray, *Reaching the Final Chapter in the Story of Peremptory Challenges*, 40 UCLA L. Rev. 517, 543-44 (1992).

[2] *Available at* https://perma.cc/5F7M-E6K4.

[3] *Available at* https://perma.cc/GKG9-L6FQ.

¶45    States have "flexibility in formulating appropriate procedures to comply with *Batson*." *Johnson v. California*, 545 U.S. 162, 168, 125 S. Ct. 2410, 2416 (2005). To ensure the guarantee of equal protection, some states have responded to *Batson's* shortcomings with court rules or by offering greater protection under state constitutions. *See, e.g.*, Cal. Civ. Proc. Code § 231.7 (2022) ("The court need not find purposeful discrimination"); *Order Amending Rules 18.4 and 18.5 of the Rules of Criminal Procedure, and Rule 47(e) of the Rules of Civil Procedure*, No. R-21-0020 (Ariz. Aug. 30, 2021) (Arizona Supreme Court order eliminating peremptory challenges in civil and criminal trials); Assemb. 8010, 244th Annual Leg. Sess. (N.Y. 2021) (referred to Senate Codes Committee, proposing to abolish peremptory challenges in criminal cases); Wash. G. R. 37 (Washington court rule adopted in 2018 eliminating the requirement of "purposeful discrimination"); *Andujar*, 254 A.3d at 620-21, 630 (considering implicit bias as part of the *Batson* framework under the New Jersey constitution); *Aziakanou*, 498 P.3d at 407 n.12 (referring the issue to the advisory committee on the rules of criminal procedure); *Washington v. Hicks*, 181 P.3d 831, 838-39 (Wash. 2008) (concluding that, under the Washington Constitution, a trial judge has discretion to find a prima facie case of discrimination when the State removes the sole venire person from a constitutionally cognizable group).

¶46    Under Washington's peremptory challenge court rule, a party may object to the use of a peremptory challenge for improper bias, or the court may raise the objection sua sponte. Wash. G. R. 37(c). The party exercising the peremptory challenge bears the

burden to articulate the reasons for exercising it.  Wash. G. R. 37(d).  The court then must evaluate the proffered reasons in light of the totality of circumstances and determine whether a "reasonable observer could view race or ethnicity as a factor in the use of the peremptory challenge."  Wash. G. R. 37(e).  The rule explains that a "reasonable observer" is someone who "is aware that implicit, institutional, and unconscious biases . . . have resulted in the unfair exclusion of potential jurors in Washington State."  Wash. G. R. 37(f). The rule also provides a list of factors to help courts make the determination; these factors include, for example, "whether a reason might be disproportionately associated with a race or ethnicity."  Wash. G. R. 37(g)(iv).  Several reasons are presumptively invalid under the rule, such as "having prior contact with law enforcement" and "expressing a distrust of law enforcement or expressing a belief that law enforcement officers engage in racial profiling."  Wash. G. R. 37(h)(i)-(ii).

¶47    Several additional state supreme courts have tasked advisory committees with recommending amendments to court rules regarding peremptory challenges, and many of them already have recommended court rules similar to Washington's Rule 37.  *See, e.g.*, New Jersey Judicial Conference on Jury Selection, *Notice Listing the Recommendations & Requesting Comments* 37-38 (Apr. 28, 2022)[4] (recommending several jury selection reforms, including a new court rule that would eliminate the requirement of "purposeful discrimination"); Sarah Bello, *Willamette Law Launches Racial Justice Task Force*,

---

[4] *Available at* https://perma.cc/XLJ6-STUT (last visited May 19, 2022).

Willamette University, https://perma.cc/5UGZ-9L7Y (Feb. 16, 2021); North Carolina Task Force for Racial Equity in Criminal Justice, *Report 2020*, 102-03 (2020)[5] (recommending an administrative rule change by the North Carolina Supreme Court similar to Wash. G. R. 37); Connecticut Jury Selection Task Force, *Report to Chief Justice Richard A. Robinson* 16-18 (Dec. 31, 2020)[6] (recommending a new general rule similar to Wash. G. R. 37); Governor's Commission on Racial Equity & Justice, *Initial Report: Policing & Law Enforcement in Kansas* (December 2020).[7]

¶48     In my view, Wellknown's argument for expanding our *Batson* framework is properly before the Court. Application of *stare decisis* counsels rejecting his argument here. But I agree that an overhaul of the rule is necessary to achieve the intent of *Batson*. *See Batson*, 476 U.S. at 87-88, 106 S. Ct. at 1718. Similar to the aforementioned states, it is time for Montana to reconsider its approach to peremptory challenges in light of our state constitution and the studies regarding *Batson's* limitations.[8]

¶49     I concur in all other aspects of the Court's Opinion.

/S/ BETH BAKER

---

[5] *Available at* https://perma.cc/JVR3-XXU6.
[6] *Available at* https://perma.cc/8VJY-46KE.

[7] *Available at* https://perma.cc/N2Q6-WKLY.

[8] I would do so by referring the issue to an appropriate commission of this Court for study and recommendation, such as this Court's existing Criminal Jury Instructions Commission, which includes trial and appellate attorneys who practice criminal law, a law professor who teaches criminal law or criminal procedure, and several district court judges. *See Criminal Jury Instructions Commission*, Montana Courts, https://perma.cc/C2S7-KEAY (last visited May 6, 2022).